The 4th District Appellate Court of the State of Illinois has now convened. The Honorable Craig H. D. Armon presiding. Good morning, Council. We'll call 4-22-0536 Quad Cities Industrial Maintenance & Construction, Inc. v. Jerry Kruckenberg. Could Council for the Appellant please state your name for the record? Good morning, Your Honor. Dave Oppenheim for Appellant. Thank you, Council. And could Council for the Appellate please state your name for the record? Good morning, Your Honor. This is Erin Welsh for the Appellant. Thank you. Council for the Appellant, you may proceed. Thank you, Your Honor. At the outset, can I reserve four minutes for rebuttal? Certainly. Okay. Your Honors, we're here on an appeal of a grant of a summary judgment. And as you well know, summary judgment ought to be granted only when there are no material questions of fact and when you are viewing the record in the light most favorable to the non-moving party. We submit that this record contains nothing but questions of fact, of law, of veracity. This summary judgment came about because the defendant's principal submitted a declaration stating that she had a telephone call with a representative from the fax broadcaster at issue. And that that broadcaster made representations within that telephone call about having consent to receive fax advertisements on behalf of the potential recipients of the fax. We took the defendant's deposition and she unequivocally disavowed those sworn statements, said that wasn't true. And I guess that's to her credit that she didn't continue to perjure herself. So instead, the defendant has made a number of arguments regarding reliance, alleged reliance by the same defendant who submitted the false affidavit about on a legalese fine print footer on the promotional fax that she was sent out of the blue in order that enticed her to hire this broadcaster in the first place. Now, I realize that review is de novo, but I wanted to pause and note that the trial court in its decision actually credits the declaration that even defendant has walked away from and doesn't mention the deposition, which is remarkable. But obviously the arguments on appeal are the arguments that have been presented in the briefs, and that's what I'm addressing. And they center on this statement in the promotional fax footer that we only send faxes to people who wish to receive them. If you're not one of those people, we've sent it to you in error and we apologize, but it's incumbent upon you to contact us and let us know so we take you off the list. Otherwise, we think you've consented. That's what the footer says. And certainly that's, I guess, a rational construction of what it means to consent to something. If I do something to you and you don't complain about it, I guess it means you liked it. But that's not how the TCPA works. And there's no evidence in the record whatsoever that this broadcaster told the defendant that we comply with the TCPA. We get prior express permission from everybody to send an advertisement on behalf of a particular client. And that's essentially what I think the defendant would need to prove under the guiding trilogy of cases from the Illinois Appellate Courts that both sides have cited in the briefs, those being Longkarovich v. Stanley Foam, CE Design v. C&T Pizza, and USCO Industries v. Poolman. Certainly, there's nothing in the record here, nothing asserted by the defendant, nothing in the documents that suggests that the defendant gave any sort of limiting instruction to this fax broadcaster apart from the sort of geographic limitation that was at issue in the C&T Pizza case. And that was followed. There's no dispute that that wasn't followed. Likewise, defendant has candidly admitted that she didn't ask if the broadcaster had taken all steps to comply with the TCPA or had obtained consent. Let me ask you a question. With regard to this form where it says, we will only send faxes to parties who wish to receive them. That seems to be the central language here the defendant is relying upon. Why shouldn't Dr. Kruckenberg, if that's pronounced correctly, when she received this information, have accepted that at face value and said, well, okay. Well, and that's what I'm trying to explain is that she can accept that at face value, but that is not prior express permission, which is what the TCPA requires and that's the problem. Well, we're talking about, however, the B2B, for lack of a better way to put it, they're clearly liable under the TCPA, but if they're an agency that is exceeding the scope of what they promised to Dr. Kruckenberg, why can't Dr. Kruckenberg rely upon their promise and thereby render her not liable under the act, even though B2B is? Because, and I find no fault with your legal construct. The problem is there's nothing in that language that was promised that wasn't done or that was done differently. It says right in that footer that what it means to them to be a person that wanted the facts, it's somebody who hasn't complained about getting an unsolicited fax. Well, that's the second sentence. It seems to me that that would be unconnected to the first, the first being we will only send faxes to parties who wish to receive them. And the second acknowledges the fact that they might make a mistake. And if they did make a mistake, we're sorry about it, but I don't see how that changes the meaning of the first sentence, certainly from the eyes of Dr. Kruckenberg, thinking, is this a statement that is worthy of acceptance? Why should the second sentence about, gee, if we make a mistake, we're sorry about it, deprive that first sentence of meaning and a basis for reliability by Dr. Kruckenberg? Well, I think we're establishing what a reasonable fact finder can construe from the entire communication. So I don't think you can read anything in isolation. And I'm really not focusing on the second one so much as the sentence further down that says, if you don't tell us that you don't want faxes, that means that you accept them, that means that you want them. And so that would be my first answer. The second is Dr. Kruckenberg herself, there's no dispute, hadn't had any contact with these people before they sent this thing to her. So obviously she can't receive it and say, aha, they only send this stuff to people who they've talked to before, because she didn't talk to them before. That would be wholly unreasonable. And finally, my third response to your question, Your Honor, I think, is that it's at least a jury question whether she even saw this and relied on it at the time the fax came in. It's really kind of fishy, especially given this false declaration that she does these things back in the early aughts. She gives a deposition in 2018, when she specifically asked if anybody from B2B made any representations about how they were acquiring the fax numbers and she says no. She gets a leading question from her counsel a couple pages later in that deposition, reading the language that you're reading to her and the questions essentially, doesn't that make you think that maybe they got consent? I don't think that counsel include the word maybe. And she says yes. And then nobody follows up. And then nothing happens. And then Akin Cump comes out and we get this declaration and we get this argument. So I think on those facts, a jury ought to get the reliance question, even if you accept that the statement was a statement of prior express permission or invitation, which we submit under the totality of the circumstances is an unreasonable reading of that statement. And so I guess another point would simply be, again, all we're saying is this shouldn't have been a summary judgment. This should have gone to a jury. And I think once you have a serious veracity question about a witness, you're immediately in jury land and you don't need to get any further. But be that either, neither, as it may, I think, and your honor may be troubled by this, but there really is a distinction between what it means to want something and what it means to have provided prior express permission or invitation for that same thing. I mean, I may want an ice cream cone, but if somebody shows up at my house with an ice cream cone and tries to bill me, I'm going to have a problem with that. So I don't think, particularly given that there was no follow-up, there were no questions about this language at the time, what does it mean that it's fair to say that the broadcaster did something that they said they wouldn't do or that they were told not to do? And that really is the standard in Lunkarevich. Likewise, the Aiken-Gump regulatory decision that defendants rely on makes clear that in order to make the business not the sender and not liable under the TCPA, the broadcaster's conduct needs to be so over-the-top that it would render futile any possible effort to comply with the law on the part of the broadcaster. And that's true on the part of the defendant, and there's no suggestion that that's true here. All we got is this undiscussed blurb at the bottom of the promo fax with no follow-up whatsoever by anybody. And we submit under these facts that this case at least should get to the jury. Unless there are any further questions, Your Honors, I'd like to reserve the balance of my time. All right. Thank you, counsel. Ms. Walsh, you're on mute. I apologize for that. May it please the court. Thank you, Your Honor. It's our position here that the facts, the material facts relevant to the court's decision, they're undisputed. It's undisputed that this representation in writing was provided to Dr. Krakenberg. It is undisputed that she read it in the first communication and that she relied on it. It is undisputed that what and what that representation did is limit the authority of Dr. Krakenberg, the authority that Dr. Krakenberg provided to B2B to sending faxes only to persons who wish to receive them. To the extent that they fax outside of that scope of authority, it was not authorized. And under agency principles, it is outside of the scope of her authority and she cannot be held liable. And plaintiff, in this case, has gone so far as to file a lawsuit to demonstrate that he did not want those faxes. So, by extension, the fax sent to plaintiff was outside of the scope of her authority. It's also undisputed that B2B exclusively controlled everything to do with the faxing. It chose the recipients. It sent the faxes. It provided the technology. Dr. Krakenberg never saw a list, did not know the name of any of the recipients until after the faxes were sent and some people complained. And more importantly, B2B held itself out to Dr. Krakenberg as an expert in the field of fax advertising and providing the impression that it was offering legal service and would be able and that, you know, as it said in the writing, the recipients wanted the faxes. Now, in Akin Gump, Akin Gump applies traditional agency principles and it holds that the seller of goods should not be vicariously liable for the agent based on that agent's, the fax broadcaster's, fraudulent or deceptive conduct. In this case, the fax, excuse me, the focus of Akin Gump is on the fraud that companies like B2B were perpetrating against small businesses like Dr. Krakenberg during the early 2000s to 2007. In fact, within the FCC's Akin Gump order, the only cases cited are those involving B2B. They do not cite a single case involving any other fax broadcasters. So I would offer that Akin Gump was decided as a result of the hundreds of lawsuits filed against B2B's former customers as a result of their deceptive conduct. Counsel, I want to ask you a few questions. Is my understanding correct that your primary claim that there's no liability is argued, I think, to the trial court is the disclaimer that appears in the advertisement, we will only send faxes to parties who wish to receive them? Correct. That's correct. What's at a minimum a distraction, if not troubling in this case, is what went on in this case. I don't understand that we have the declaration by Dr. Krakenberg only to be essentially disagreed with by her second deposition. And it seems to me from the point of view of the plaintiff, I guess the best you can say about all this is, as Mr. Oppenheim mentioned, to her credit, she's not claiming things that aren't true, but procedurally, this is a mess. And what's going on here? And is it your position that we should disregard that declaration and as well as the second deposition? And how did this all come about? Your Honor, thank you. It is not a position that you should ignore the second deposition. With regard to the affidavit, her statements as to conversations with B2B, you know, she made those statements, it was based on her belief at the time. During the deposition, she recalled differently, and she testified differently. However, the real important point here is that in fact, her affidavit and testimony with regard to conversations with Kevin and B2B are not in fact material to the decision on summary judgment, because the fact, the representations in writing that the vaccine would be limited to only to people who wish to receive them are undisputed. So in answer to my question, you're asking us to essentially disregard the business about her declaration of the second deposition and the inconsistencies within it on the grounds that it doesn't matter. You know, Your Honor, I wouldn't say disregard entirely, because I do think her testimony at her second deposition is relevant and provides material facts. The inconsistency between her affidavit and her testimony, you know, I think that that is, I would offer that that is not material to what actually demonstrates that summary judgment is warranted, which is the written representation. Go ahead. Okay, thank you, sir. So, so, in this case, the facts establishing that B2B perpetrated deceptive conduct against Dr. Krokenberg, and that without that deception, plaintiff would not have received the offending facts, those facts are undisputed. First, there's the written representations to Dr. Krokenberg, which were received on more than one occasion, that it only facts persons who wish to receive the faxes. That was a limitation of their authority. Thus, to the extent any faxes were sent outside the scope, including the plaintiff, Dr. Krokenberg should not be held- Counsel, is there any dispute of that fact? Of which fact, sir? That Dr. Krokenberg received an assurance from B2B that they would only send faxes to people who had requested them. With regard to the written communication, no, there's not a dispute of that. Dr. Krokenberg has testified that initially that statement is in the record, it is in the documents that were produced by plaintiff and B2B in this case, which are the communications between Dr. Krokenberg and B2B, and Dr. Krokenberg confirmed during her deposition that that language was at the bottom of every fax she received from them. Okay. And because the scope of authority was limited to people who wanted to receive the faxes, and B2B violated that scope of authority by faxing plaintiff, that makes this case all on fours with Pullman, U.S. Gold vs. Pullman, Bridgeview, Poldoside, and all the other courts that have said- liable for B2B's deceptive treatment of their customers. But for B2B's misconduct in representing that it would only fax people who wanted the faxes and then sending it to other people. But for that statement, there would have been no TCPA violation because had B2B in fact only sent faxes to people who wished to receive them, they wouldn't have faxed plaintiff because plaintiff didn't want it. And then plaintiff would not have any complaint. Is there any dispute, Counselor, with the fact that B2B never requested any list of potential receivers from Dr. Krokenberg? B2B's business model was not to request the receivers. They had a large InfoUSA purchase list, and that was what they were offering. That was their entire business model was that they would say we can fax these faxes out to people who we have relationships or who wish to receive them. And in fact, what that really was was an InfoUSA list, unbeknownst to their customers, if that makes sense. So, no, they did not make that request. And they also did not offer Dr. Krokenberg any, there's no evidence that they offered Dr. Krokenberg information on the identities of the fax recipients or the targets of the faxes, if that makes sense. Okay, second, it's not disputed that it was B2B and Dr. Krokenberg who exclusively controlled the means and methods of the faxing. B2B and his partner in Macaw in Romania actually sent the faxes. B2B and Macaw chose the recipients of the fax, and they didn't even inform Dr. Krokenberg to whom the fax would be sent. So she, even if she had known, so in essence, she had no way to verify whether B2B's promise that they were sending faxes only to those who wish to receive them was true or not, because she didn't have the identities of the people who would be receiving these faxes, so she couldn't call them. And the third thing that I think is relevant to the background, and certainly when we take it in context of Akin Gump, is that B2B's entire business model was based on falsely holding itself out as an expert in fax advertising that offered a legitimate service to people, when this was in fact not the case. Dr. Krokenberg's testimony in this regard, that she believed that B2B was an expert at offering a legal service, that's undisputed. And equally as undisputed and demonstrated in countless court decisions, is B2B's very lengthy history of misleading other small businesses in the same way that it misled Dr. Krokenberg. So is the real issue here the reasonableness of the reliability of Dr. Krokenberg upon the disclaimer? Um, well, and I just want to clarify, at the time that B2B contacted Dr. Krokenberg back in 2005, Dr. Krokenberg had no reason to know that B2B was sort of involved in this nefarious business. It was very early, there was not a record on B2B the way there is today. I don't know if that answers your question, if you were talking reasonableness in 2005 or reasonableness today. Well, Mr. Oppenheim seems to be arguing that at a minimum, it's a question of fact, whether or not under the circumstances presented by this record, of course, there is that business I mentioned earlier, where we have that mess in the record about the declaration and then the second reposition. He seems to be arguing that, in light most favorable to Dr. Krokenberg, which isn't really standard on a motion of summary judgment anyway, that her reliability upon this disclaimer was not reasonable, or at least should be a question of fact for the jury. Why isn't he correct? Well, Your Honor, first of all, I would submit that from a reasonable person standard, when someone offers you a service and claims to be an expert, especially someone in Dr. Krokenberg's position who is a sole proprietor, it's reasonable to expect that that service is legal and that their representations are accurate. I would submit that. And second, I would note that we are not, in this case, we are not raising an affirmative defense. This is vicarious liability. Plaintiff would bear the burden of proof at trial. And I think it's worthwhile to note that, you know, plaintiff has not presented any affirmative evidence showing that basically disputing the reasonableness of Dr. Krokenberg's reliance or showing that she didn't rely on it or anything like that. Instead, plaintiff sort of makes these speculative arguments that, oh, someone wouldn't have relied on this or states that that's unreasonable. But there's no support for those statements. Can we consider the deposition of Dr. Krokenberg from 2018? Is that where a lot of these actual vermin come from, as opposed to the later declaration, the second deposition, which are inconsistent with each other? In other words, with the second deposition declaration, their inconsistency, is that something we should disregard and just consider the 2018 deposition and what's contained therein? Is that still appropriately before us? Okay, I want to clarify. I do not believe that there is an inconsistency between Dr. Krokenberg's first deposition and the affidavit. And as to the inconsistency... Is that my question? Okay, I just want to be clear on what you're... Go ahead. As to the... And I just want to be clear, that's not what you're... Okay. And as to the inconsistency between the affidavit and the 2018 deposition, I think, you know, while it could certainly be considered, I don't think it's relevant because it doesn't go to her understanding of the written representations. It deals solely with, you know, a conversation and not the written representations. But I do think the 2018 deposition transcript is relevant and should be considered. Was that her first deposition? There was a later... How does that... What's the timing of this? So there was initially a deposition, I believe, in 2000... I want to say 16, but I could be incorrect. An earlier deposition. And then there was a lot of briefing on class certification and a separate summary judgment motion. Akin Gump came out. We filed the instant motion with the affidavit and then plaintiff sought to see this... Sought to take the separate second deposition in 2018 or 2020. So there is a first deposition that we can consider with disregard to the second deposition in the declaration? I would say, Your Honor, I would say the evidence is all in the record. It's all there to be considered. However, to the extent there's an inconsistency between her testimony regarding any oral representations made by B2B. I don't think those... That inconsistency is relevant to the instant motion because the instant motion is based on the written representations because summary judgment is sufficiently granted based on the written representations alone. Go ahead. Okay. So, I wanted... Moving on, I wanted to address a few other issues. I wanted to note that, you know, Dr. Krokenberg... Excuse me. You know, I wanted to distinguish... Excuse me. Okay. I wanted to distinguish this case from Lankovich and some of the other... The Lankovich decision. In that case, there was never any reliance on any kind of limitation provided by B2B or communicated to B2B or anything. That case was based simply on a miscommunication between the defendant and the defendant's independent contractor, who then communicated with B2B. And in this case, clearly, it was an affirmative representation made by B2B to Dr. Krokenberg that she relied upon with regard to whom they would be sending faxes. And I... You know, under Illinois law and vicarious liability, as to vicarious liability, because B2B sent faxes outside of the scope of that limitation, Dr. Krokenberg should not be liable. And Akin Gump provides the additional sort of gravitas of saying, because B2B acted fraudulently in doing so and presented itself fraudulently to Dr. Krokenberg, that provides an additional reason as to why she should not be held liable for its improper faxing. Thank you, Your Honor. I am... Your Honors, I'll yield the rest of my time. Thank you, Counsel. Mr. Offenheim, rebuttal? Yes, Your Honor. Lankarovich says that what matters is what B2B understood that it was being hired to do. There is no question here that it did what it was being hired to do. And Counsel took a lot of time to talk about the various body of case law around the country involving clients of B2B and violating the Telephone Consumer Protection Act. I hope it would not surprise you to learn that in every one of those cases, or in, let me back up, in most of those cases, the business who hired them was found liable, depending on the facts of the cases. In every single one of those cases, they sent the same form, promo fax, that is involved in this case. They did that in Lankarovich. They did that in every case. And while Counsel might wish the law was such that if you make a statement of puffery, like, we only send faxes to people who want to receive them, and then explain later that your conception of that is that people who haven't told us to quit sending us faxes amounts to a representation, a warranty, a limitation, anything to limit the scope of agency, then the defendants would have won every single case. They haven't. Let me ask you a question. Is it puffery in 2005? Absolutely. I mean, what's that? Why? Because... Would you agree, and I may have the chronology wrong, but would you agree that in 2005, this was still a relatively new business effort or business device, and hadn't received all the scrutiny and criticism that led to it? That might be true. I want to say, though, that the Illinois Appellate Court had already decided the GM sign versus Swiderski decision by that point, while the Supreme Court took it up in 06. There's definitely some publicity about the statute and about violating it. The statute's been around since 1991. So, yeah, I mean, I think that the old maxim is ignorance of the law is no excuse. And if someone wants to hire a fax broadcaster, whether it's in 2005 or 2023, they ought to take some steps to determine whether they're going to run afoul of the TCPA. Following up on that, Mr. Oppenheimer, let me ask you, it seems as if you are essentially arguing that the fraud exception applies only when there is an express, explicit, unequivocal misrepresentation or premise. Is that your position? I think so, yes. And I also think there's really no evidence of fraud here. Certainly, there's no evidence that B2B said anything deliberately untrue. We can quibble about what want to receive the means and its import, and certainly we dispute, as Your Honors pointed out, the reliance on anything said in that footer. Well, when they said we were only sending faxes to parties who wish to receive them, essentially what you're arguing is that was a fraudulent statement. And Dr. Kruckenberg either should have known that or should have taken steps to figure that out. No, I'm saying that thinking that you only send faxes to people who wish to receive them because you remove the people who don't from your list is a nice practice and all, and that's what they did, but it's not TCPA compliant, that's all. And I think... I don't want to run afoul of the TCPA, so tell me about how you're going to do that. And had B2B or this other business then responded, would that have been enough for Dr. Kruckenberg or the other person to then have decided, I can rely upon these representations? 100%. I mean, that if there was something that was stated that was, this is what we're gonna do, actual nuts and bolts, and then they didn't do it, that's USCO, that's C&T Pizza. There wasn't anything like that here. Well, someone like Dr. Kruckenberg, and we're talking about an expenditure of all of $168 as an advertised thing, how much time and effort should be required of her to check out who are these people and are they really trustworthy? Well, and Your Honor, that's an interesting question. It's one that the FCC certainly has wrestled with over the years in defining who ought to be liable under the statute. But ultimately, they've come down where they have and said that under most circumstances, the sender is liable. And that it's not the broadcaster's job to make sure that everything's legally compliant. It's the client's. That's just how the law works. And just I guess the final point, because I know I'm out of time, that there's nothing in the record here that B2B was saying it was an expert in the law or that they were being fraudulent or deceptive. That is entirely wishful thinking. They have this gobbledygook, barely comprehensible footer on their facts. The defendant thought it was a good idea to hire them. I think the operative statement that you made was that you were out of time. Very well, Your Honor. Thank you. Thank you very much, counsel. The court will take this matter under advisement. The court stands in recess.